## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DENISE SENECAL
3212 Ashmead Place, N.W.
Washington, DC 20009

        Plaintiff,

    v.

CALLAHAN & ASSOCIATES, INC
1001 Connecticut Ave., N.W.
Suite 1001
Washington, D.C. 20036

        Defendant.

Civil Action No. _____

`

### NOTICE OF REMOVAL

Defendant Callahan & Associates, Inc. ("Callahan"), pursuant to 28 U.S.C. §§ 1331 and 1446, hereby removes this action from the Superior Court of the District of Columbia. Callahan states the following grounds for removal:

1.    On July 22, 2011, Plaintiff Denise Senecal commenced a civil action against Callahan by filing a Complaint in the Superior Court for the District of Columbia at docket number 0005892-11. Callahan was served on September 15, 2011. In accordance with 28 U.S.C. § 1446(a), true and correct copies of all process, pleadings, documents, and orders of which Callahan is aware are attached hereto as Exhibit 1.

2.    The Complaint is removable because paragraph 115 of the Complaint alleges that Callahan "failed to provide an election notice regarding health insurance to Ms. Senecal upon her termination as required by the federal Consolidated Omnibus Budget Reconciliation Act (COBRA), Pub.L. 99-272, 100 Stat. 82," alleging that "this is further evidence of Callahan's

willingness to violate D.C. and federal law." Complaint ¶ 115. Accordingly, this Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1441.

3.      Callahan has not served any answer or responsive pleading to Plaintiff's Complaint or made any appearance of argument before the Superior Court for the District of Columbia in this matter.

4.      Callahan submits this Notice of Removal without waiving any defenses to the claims asserted by Plaintiff or conceding Plaintiff has pled claims upon which relief can be granted, or conceding Callahan has been properly served.

5.      This Notice is filed with this Court within thirty (30) days after Callahan received a copy of the Complaint upon which this action is based.

6.      Upon filing this Notice of Removal, Callahan will provide a written notification to Plaintiff and will file a Notification of Removal with the Clerk of the Superior Court for the District of Columbia as required by 28 U.S.C. § 1446(d).  A true and correct copy of the Notice to All Parties of Filing Notice of Removal is attached hereto as Exhibit 2.

WHERETOFORE, Callahan respectfully requests that the above-captioned matter currently pending in the Superior Court for the District of Columbia be removed to this Court.

Respectfully submitted,
**JACKSON LEWIS, LLP**

October 4, 2011

Teresa Burke Wright (D.C. Bar No 429196)
JACKSON LEWIS, LLP
10701 Parkridge Blvd., Suite 300
Reston, VA  20191
Tel:    (703) 483-8300
Fax:    (703) 483-8301
E-mail: WrightT@jacksonlewis.com

Counsel for Callahan & Associates

3

## CERTIFICATE OF SERVICE

I herby certify that on October 4, 2011, a true and correct copy of the foregoing *Notice of Removal* was served on all parties by U.S. mail, with postage properly affixed and addressed as follows:

> Robert B. Fitzpatrick, PLLC
> 1825 Connecticut Avenue, NW
> Universal Building South
> Suite 640
> Washington, DC 20009

Teresa Burke Wright (D.C. Bar No 429196)
JACKSON LEWIS, LLP
10701 Parkridge Blvd., Suite 300
Reston, VA  20191
Tel:     (703) 483-8300
Fax:     (703) 483-8301
E-mail: WrightT@jacksonlewis,com

Counsel for Callahan & Associates

4820-9655-8602, v. 1

# Exhibit 1



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

DENISE SENECAL
  Vs.

CALLAHAN & ASSOCIATES, INC.

C.A. No.    2011 CA 005892 B

## <u>INITIAL ORDER AND ADDENDUM</u>

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Lee F. Satterfield

Case Assigned to: Judge MICHAEL L RANKIN
Date:  July 22, 2011
Initial Conference: 9:00 am, Friday, October 21, 2011
Location:  Courtroom 517
        500 Indiana Avenue N.W.
        WASHINGTON, DC 20001

Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 105, 515 5th Street, N.W. (enter at Police Memorial Plaza entrance). Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield

Caio.doc



**Superior Court of the District of Columbia**
CIVIL DIVISION
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

_Ms. Denise Seneca_
_____
Plaintiff

vs.

_Callahan & Associates, Inc._
_____
Defendant

Case Number   **0005892-11**

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

_Robert B. Fitzpatrick_
Name of Plaintiff's Attorney

_1825 Connecticut Ave. N.W. #640_
Address

_Washington, D.C. 20009_

_202-588-5300_
Telephone

Clerk of the Court

By _____
Deputy Clerk

Date   **JUL 22 2011**

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828 로 전화주십시요     ?ኣማርኛ ?ተርጓሚ ለማማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-682-2700) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

FORM SUMMONS - Jun. 2011                                                                        CASUM.doc





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Teléfono: (202) 879-1133

_Ms. Denise Seneul_
_____
Demandante

*contra*

_Callahan & Associates, Inc._
_____
Demandado

Número de Caso: _____

**CITATORIO**

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veinte (20) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que Usted le entregue al demandante una copia de la Contestación o en el plazo de cinco (5) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_Robert B. Fitzpatrich_
Nombre del abogado del Demandante

_1825 Connecticut Ave, N.W. #640_
Dirección

_Washington, DC. 20009_

_202-588-5300_
Teléfono

_SECRETARIO DEL TRIBUNAL_

Por: _____
Subsecretario

Fecha _____

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828 로 전화주십시오        የአማርኛ ትርጉም ከፈለጉ (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO, O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍAN RETENERLE SUS INGRESOS, O PODRÍAN TOMAR SUS BIENES PERSONALES O RAÍCES Y VENDERLOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede afrontar el costo de uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-682-2700) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse de otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CASUM.doc

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

Ms. Denise Senecal )
3212 Ashmead Place, N.W. )
Washington, D.C. 20009 )
)
Plaintiff, )
)
v. )
)
Callahan & Associates, Inc. )
1001 Connecticut Avenue, N.W. )
Suite 1001 )
Washington, D.C. 20036, )
)
SERVE ON: )
C T Corporation System )
1015 15th Street, N.W. )
Suite 1000 )
Washington, D.C. 20005 )
)
Defendant. )
)
)

Civil Action No. 0005892-11
Jury Trial Demanded

RECEIVED
Civil Clerk's Office
JUL 2 2 2011
Superior Court
of the District of Columbia
Washington, D.C.

FILED
CIVIL ACTIONS BRANCH
JUL 2 2 2011
Superior Court
of the District of Columbia
Washington, DC.

**PLAINTIFF'S COMPLAINT**
**(Age and Race Discrimination in Violation of the D.C. Human Rights Act)**

Ms. Denise Senecal (hereafter "Ms. Senecal" or "Plaintiff"), for her Complaint

against the defendant Callahan & Associates, Inc. (hereafter "Callahan" or "Defendant"),

hereby states as follows:

1. This is a complaint for damages and other relief for age and race discrimination

   in violation of the District of Columbia Human Rights Act, D.C. Code §§ 2-1401.1

   et seq.

2. Jurisdiction is based on D.C. Code § 11-921.

3. Ms. Senecal resides at 3212 Ashmead Place, N.W., Washington, D.C. 20009.

4. Callahan is headquartered in Washington, D.C., having its offices at 1001 Connecticut Avenue, N.W., Suite 1001, Washington, D.C. 20036.

5. On June 1, 2011, Ms. Senecal and Callahan entered into a tolling agreement, stating as follows:

    a. "[Ms.] Senecal and [Callahan] agree that in determining the applicability of the statute of limitations to [Ms. Senecal's claims against Callahan], and any counterclaims [Callahan] may assert thereto, the period from June 1, 2011, through and including the fifth (5th) business day following the transmittal of the notice [of termination of the tolling agreement], shall not be included." Exhibit A, Tolling Agreement.

6. Callahan transmitted notice of termination of the tolling agreement on Friday, July 15, 2011, and acknowledged that the tolling agreement is terminated as of Friday, July 22, 2011.

## STATEMENT OF FACTS

I. **Introduction**

7. On July 21, 2010, Ms. Senecal, then 45 years old, was terminated by Callahan, a youth-oriented company that regularly filled open positions with non-African-American recent college graduates with little or no professional experience.

II. **Background**

8. Ms. Senecal was born on January 27, 1965 in Annapolis, Maryland. She is Caucasian.

2

9. In 1987, Ms. Senecal graduated from Syracuse University with a Bachelor of Science degree in marketing. In 1992, Ms. Senecal graduated from the University of Texas at Dallas with a Master's degree in business.

10. From November, 1994 until July, 2001, Ms. Senecal worked at Opinion Research Corporation, a market research consulting firm that employed approximately three hundred (300) individuals. She held progressively higher level positions during her time at Opinion Research Corporation. Ms. Senecal started as a Senior Research Associate. After approximately two years, she was promoted to Analyst. After approximately two more years, she was again promoted to Consultant. When Ms. Senecal started working for Opinion Research Corporation, she earned forty two thousand dollars ($42,000.00) per year. By July, 2001, she earned seventy nine thousand five hundred dollars ($79,500.00) per year. Ms. Senecal received raises and bonuses each year she worked for Opinion Research Corporation. In July 2001, Opinion Research Corporation laid Ms. Senecal off in a reduction in force of approximately 10 employees. Ms. Senecal's layoff from Opinion Research Corporation was not related to Ms. Senecal's job performance.

## III. **Callahan Business and Structure**

11. Callahan is a financial consulting firm which specializes in consulting services for credit unions. Callahan has approximately three hundred (300) credit union clients. Callahan provides a variety of products to credit unions and credit union

vendors, including financial analysis software, consulting services, research reports and webinars.

12. The consulting services which Callahan provides to credit unions and credit union vendors include performance analysis of specific credit union units, analysis of the credit union market, and recommendations to credit unions. Performance analyses include, for example, whether a particular credit union should enter the student loan business, or whether a particular credit union should sell its loans to another financial institution. Callahan gets underlying data from the National Credit Union Administration, an independent federal agency that charters and supervises federal credit unions, and repackages that data for its credit union customers.

13. Callahan's financial analysis software calculates financial performance metrics that credit unions can use to compare performance against similar credit unions.

14. Some of the research reports provided by Callahan include information Callahan acquires by surveying marketing managers at credit unions about marketing budgets and marketing plans. Other research reports include information Callahan acquires by surveying technology professionals at credit unions about their technology budgets and plans.

15. The webinars which Callahan provides for its clients cover a range of topics, including marketing to members of credit unions, succession planning, strategies for dealing with governmental special assessments, social media and its impact

on credit unions, and strategies for handling new governmental regulatory requirements.

16. Callahan employs approximately forty (40) individuals.

17. Callahan's executive team currently consists of the following individuals: Charles W. "Chip" Filson (hereafter "Mr. Filson"), a Caucasian male in his 60s, is the President of Callahan. Alix (Filson) Patterson (hereafter "Mrs. Patterson"), a Caucasian female in her 30s and daughter of Mr. Filson, is Callahan's Chief Operating Officer. Scott Patterson, a Caucasian male in his 30s and husband of Alix (Filson) Patterson (hereafter "Mr. Patterson"), and son-in-law of Mr. Filson, is Callahan's Vice President of New Business Innovation. Jay Johnson (hereafter "Mr. Johnson"), a Caucasian male in his 40s, is the Executive Vice President of Callahan. Jon Jeffreys, a Caucasian male in his 30s, is the Vice President of Callahan Financial Services.

18. Callahan hired young relatives of executives to work in the office. For example, as noted above, Callahan employed Mr. and Mrs. Patterson, Mr. Filson's daughter and son-in-law. Callahan also employed Annie Sebastian (hereafter "Ms. Sebastian") and Patrick Sebastian (hereafter "Mr. Patrick Sebastian"), the Caucasian children of Wendell "Bucky" Sebastian (hereafter "Mr. Wendell Sebastian"), one of the founders of Callahan. Ms. Sebastian, a Researcher, and Mr. Patrick Sebastian, an intern, were both in their 20s when they worked at Callahan.

19. Employees at Callahan are assigned to work groups. The groups changed several times over the course of Ms. Senecal's employment with Callahan. As of July, 2010, when Ms. Senecal's employment with Callahan was terminated, there were four groups, including consulting/leadership, industry analysis, media/marketing, and programming. At the time of Ms. Senecal's termination, she was in the consulting/leadership group.

IV. **Ms. Senecal's Hiring and Initial Responsibilities with Callahan**

20. On January 7, 2002, Ms. Senecal, then thirty six (36) years old, responded to a help wanted advertisement on Monster.com from Callahan for a Researcher position. She was interviewed by Mr. Filson, and hired by Mr. Patterson. She initially was assigned to the e-commerce group.

21. Ms. Senecal was hired as a part-time employee. Ms. Senecal had given birth to her son in 2001, and needed time at home to care for him. Ms. Senecal and Mr. Patterson agreed at that time that she would work three days per week.

22. Ms. Senecal was classified as an hourly employee the entire time she worked at Callahan. She received several raises while with Callahan. Ms. Senecal's starting salary was thirty five dollars ($35.00) per hour. By 2005, she was earning forty dollars ($40.00) per hour. By 2006, she was earning forty two ($42.00) dollars per hour. By 2007, she was earning forty four ($44.00) dollars per hour. By 2008, she was earning forty five dollars and fifty cents ($45.50) per hour. As of her last date of employment, Ms. Senecal earned forty seven dollars and fifty cents ($47.50) per hour.

23. Ms. Senecal occasionally worked more than forty (40) hours per week. On those occasions, Ms. Senecal was not paid time and a half. Instead, she received her normal compensation for hours worked in excess of forty hours per week.

24. Ms. Senecal's supervisor when she was hired was Mr. Patterson. At the time that Ms. Senecal was hired, Mr. Patterson was in his mid-20s. He is now in his mid-30s.

25. Ms. Senecal was hired as a researcher. As of 2009, Ms. Senecal's duties included the following:

   a. "Lead Survey Consortium, including developing and executing topics with members, building client base, and evaluating business model.

   b. Build recognized expertise in internet strategies through regular analysis/commentary on key issues impacting credit unions. Gain an understanding of the market and competitive context by interpreting relevant publications and articles and engaging in ongoing interaction with experts from within and outside the credit union industry. Drive Revenue through speaking engagements.

   c. Evaluate and develop other research projects as appropriate, including partnerships with SCS[1] and other vendors.

   d. Work across business units on Callahan research projects as they are determined.

---

[1] SCS, or Sneider Consulting Services, was a partner of Callahan at the time.

    e. Work with Content positions in Media and Analytics business units to
ensure a cohesive approach to Callahan's industry analysis and
research."

Exhibit B, Callahan Researcher Position Description.

26. In addition to the duties listed in Ms. Senecal's Position Description (Exhibit B),
Ms. Senecal was also responsible for designing and testing surveys, and
reporting and presenting data to clients. The surveys conducted by Ms. Senecal
when she first started working at Callahan were related to customer service
through online banking at credit unions. Ms. Senecal typically chose what
surveys to conduct, but at times she worked with credit union clients to choose
surveys subjects. The data she presented to clients was data that came from the
surveys.

27. The "Survey Consortium" mentioned in Ms. Senecal's Position Description,
(Exhibit B), was the Internet Strategy Consortium (ISC). ISC was an online
surveying service that Callahan provided to its credit union customers.

28. As manager of ISC, Ms. Senecal directed other Callahan employees to
undertake specific tasks, such as writing articles, conducting research on credit
unions, or conducting or promoting webinars. She did not hire or terminate
employees.

29. Ms. Senecal's workload and hours worked varied. She received benefits including a 401(k) plan, medical insurance, and profit sharing. Ms. Senecal did not get paid vacation or sick leave.

30. Ms. Senecal kept abreast of developments in her field by learning about the credit union business, including reading industry news and regulatory information, interviewing credit unions and technology vendors, attending webinars, and attending the annual Government Affairs Conference, a credit union and vendor conference in Washington, D.C., sponsored by the Credit Union National Association, a lobbying and trade association for credit unions.

## V.  Ms. Senecal's Expanding Responsibilities With Callahan

31. Throughout her employment, Ms. Senecal developed detailed knowledge of how credit unions use social media and web sites to reach out to customers, conduct business, and market themselves. Ms. Senecal's extensive knowledge of this subject was acknowledged by her supervisors at Callahan.

32. Ms. Senecal's duties expanded over time. In the Fall of 2003, Callahan laid off a good friend of Ms. Senecal, Ms. Charylene Ledbetter (hereafter "Ms. Ledbetter"), an African-American researcher in her early 30s. Shortly thereafter, Mr. Patterson made Ms. Senecal responsible for all survey research efforts throughout Callahan. Ms. Senecal developed survey questionnaires and provided results of those surveys to clients. At that time, Ms. Senecal also became responsible for internal studies and research reports, which Ms. Ledbetter had handled prior to her termination.

33. In 2003, Mr. Patterson assigned Ms. Senecal to periodically produce webinars for Callahan. Ms. Senecal continued to produce webinars throughout the remainder of her employment at Callahan. As part of those duties, Ms. Senecal hosted webinars for Callahan. Typically Ms. Senecal would speak to the attendees to provide an introduction, and go over introductory slides. Ms. Senecal then usually turned the webinar over to others who would speak on related subjects. Approximately 25 people attended Ms. Senecal's webinars, on average. After each webinar, attendees could take an optional survey regarding the quality of the webinar. Ms. Senecal's presentations were consistently highly rated by the attendees.

34. Ms. Senecal also acted as a company representative with the press. She put out press releases when she conducted surveys for ISC. Sometimes reporters called her for interviews after the press releases. She has been quoted in related stories for the Credit Union Times and the Credit Union Journal.

35. As Ms. Senecal's duties increased, as described in paragraphs 32-34, supra, her average hours increased. In 2009, Ms. Senecal began working four days a week, and averaged thirty two (32) hours per week. Ms. Senecal had previously averaged twenty four (24) hours per week. Despite the increase in hours and duties, Ms. Senecal was not promoted.

36. Callahan frequently hired inexperienced non-African-American paid interns or associates under the age of twenty five (25) to work with Ms. Senecal as she

conducted her research. These interns and associates reported to Mrs. Patterson.

37. Ms. Senecal received annual performance reviews. Her reviews were always positive.

38. In November 2004, Ms. Senecal's supervisor changed from Mr. Patterson to Brad Myers (hereafter "Mr. Myers"), Callahan's Vice President of Sales, a Caucasian male in his thirties. Ms. Senecal worked under the supervision of Mr. Myers until June, 2006, after which she was supervised by Mr. Johnson. Mr. Johnson was Ms. Senecal's supervisor for the remainder of her term of employment with Callahan.

39. Callahan employees received profit sharing bonuses based on year-end profits. Vice Presidents decided whether to award bonuses, which employees received bonuses, and the amount of the bonuses. Some years Ms. Senecal received bonuses, and some years she did not. In 2003, Ms. Senecal received a bonus of one thousand dollars ($1,000.00). In 2004, Ms. Senecal received a bonus of eleven thousand nine hundred and seven dollars ($11,907.00). In 2009, Ms. Senecal received a bonus of eight hundred dollars ($800.00). In 2010, Ms. Senecal received a bonus that was deposited directly into her 401(k) account. She did not have the option of receiving a cash bonus.

## VI. <u>Age Discrimination by Callahan Against its Employees, Including Ms. Senecal</u>

40. Ms. Senecal was born on January 27, 1965. She turned forty five (45) on January 27, 2010.

41. When Ms. Senecal was hired on January 7, 2002, Callahan did not have any employees over fifty (50) years of age other than Mr. Filson.

42. When Ms. Senecal was hired on January 7, 2002, there were only two employees over forty (40) years of age at Callahan, Mr. Filson and Dennis Crayon (hereafter "Mr. Crayon"), a Caucasian male, who was Callahan's Senior Web Designer.

43. By July of 2010, there were only four (4) Callahan employees over fifty (50) years of age, including Mr. Filson, Mr. Crayon, Mr. Mike Philbin (hereafter "Mr. Philbin"), and Ms. Kathy Hoyle (hereafter "Ms. Hoyle").  Ms. Hoyle, a Caucasian female, was a receptionist with Callahan.  Mr. Philbin, a Caucasian male, was the Vice President of Sales for Callahan's subsidiary company, Callahan Financial Services.

44. By July of 2010 there were only eight (8) Callahan employees over forty (40) years of age, including Ms. Senecal, Mr. Filson, Mr. Crayon, Mr. Philbin, Ms. Hoyle, Leigh Anne Terry (hereafter "Ms. Terry"), Allan Pierce and Mr. Johnson. Ms. Terry, a Caucasian female, was the Human Resources Manager for Callahan. Mr. Allen, a Caucasian male, was a sales person for Callahan.

45. Mr. Crayon worked for Callahan for ten (10) years, but never received a
promotion.

46. Despite her experience and success at Callahan, due to Ms. Senecal's age, in
the year leading up to June of 2010, Ms. Senecal's duties began being assigned
to much younger and less experienced personnel, including non-African-
American interns, as is described in subsequent paragraphs.

47. In October, 2009, Ms. Senecal conducted a consumer survey on social media. In
November, 2009, she produced a related webinar, which was highly rated by
participants. In December, 2009, Mrs. Patterson assigned Chris Tissue (hereafter
"Mr. Tissue"), a Caucasian male Industry Analyst in his early 20s, to conduct a
second consumer survey on social media. Ms. Senecal notified Mr. Johnson and
Mrs. Patterson that Mr. Tissue did not have the experience necessary to produce
the webinar. Mr. Johnson and Ms. Patterson responded by asking Ms. Senecal
to work with Mr. Tissue to complete the webinar.

48. As of June, 2010, Callahan employed three (3) Caucasian college age paid
interns: Alexandra Gekas (hereafter "Ms. Gekas"), Mr. Patrick Sebastian, and
Ms. Becca Clark (hereafter "Ms. Clark"). The interns were assigned work by Mrs.
Patterson, Callahan's Chief Operating Officer and daughter of Mr. Filson. The
interns, rather than Ms. Senecal, were assigned to write website articles about
reaching credit union members through credit union web sites, and related new
technologies, a task that Ms. Senecal had performed up to that point

49. In June, 2010, instead of Ms. Senecal, Ms. Gekas, an approximately twenty (20) year old intern who was still in college and had no experience in credit unions or creating webinars, was assigned by Mrs. Patterson to produce a webinar on social media use by credit unions that required significant research. Ms. Senecal had produced the previous webinar, which was highly rated by attendees who completed an online survey after the event, and had conducted a related study. Ms. Gekas was subsequently hired as a full-time employee by Callahan.

50. In January of 2010, Callahan announced that (i) the company was moving to an incentive-based bonus plan, (ii) individual managers would develop goals, and (iii) financial bonuses would be paid quarterly. However, because of Ms. Senecal's age, her manager, Mr. Johnson, did not develop a bonus plan for Ms. Senecal, and Ms. Senecal received no bonuses. Mr. Johnson did not tell Ms. Senecal why she did not receive a bonus. Other younger employees did receive incentive plans and bonus payments, including Mr. Sam Brownwell (hereafter "Mr. Brownwell"), a Caucasian male Industry Analyst employee in his early 20s.

51. Also in 2010, Callahan announced that if certain company-wide sales goals were met, employees would receive one extra day of vacation. Callahan met the goal, but when Ms. Senecal tried to take the vacation day, Mr. Johnson told her that she was not allowed to take it. Mr. Johnson explained the extra vacation day was a "non-cash benefit." He did not explain what that meant to Ms. Senecal, but Ms. Senecal interpreted it to mean that because she did not get vacation, she would have received payment for the extra day rather than a paid day off of work. All

14

other Callahan employees were allowed to take the vacation day, including the many Callahan employees who were younger than Ms. Senecal.

52. On July 13, 2010, Callahan announced that Ms. Marissa McGee (hereafter "Ms. McGee"), a Caucasian female Marketing Manager working in the media/marketing group, was given a new Relationship Manager position in Ms. Senecal's group, the consulting/leadership group. Ms. McGee's position was a salaried, full-time position. Ms. McGee was in her mid-20s at the time, and had been with Callahan for three (3) years. Before the promotion, Ms. McGee worked in sales, selling advertising space for Callahan. Ms. McGee was promoted by Mrs. Patterson. The Relationship manager position was not a sales position. It required establishing and maintaining relationships with current credit union customers of Callahan who had signed up for annual benefits packages, and keeping them informed about Callahan products and services.

53. The Relationship Manager position was not posted internally, and Ms. Senecal was not given an opportunity to apply for it. Ms. Senecal had the experience to fill the position from her time managing the ISC, where she regularly worked with credit union customers to provide surveys and other Callahan services. Ms. Senecal would have applied for the position if she had known it was available.

54. Beginning in early 2010, during staff meetings, Mr. Filson and Mrs. Patterson often handed out twenty dollar ($20.00) bills to younger Callahan staffers for "going above their duties." Some young staff members received multiple twenty dollar ($20.00) bills, totaling up to one hundred dollars ($100.00) per person. Ms.

Senecal never received such a payment. There was no formal process for the distribution of cash bonuses.

55. No Callahan employees over forty (40) years of age received such bonuses for "going above their duties." Mr. Tissue, Ms. Lydia Cole (hereafter "Ms. Cole"), a Caucasian Industry Analyst in her twenties, and Mr. Nick Connors, a Caucasian Industry Analyst in his twenties, all received bonuses.

56. Mrs. Patterson rejected a proposal created by Ms. Senecal for a new vendor-sponsored project that would generate approximately fifteen thousand dollars ($15,000.00) in revenue for Callahan. Normally Ms. Senecal would submit such a proposal to Mr. Johnson, but he was on vacation at the time, so she submitted it to Mrs. Patterson instead.

57. The proposal was to conduct an online survey regarding credit union sales training methods for a vendor. It included surveying, data analysis, report generation, and presentation of the results. In addition, Callahan would have had access to the data generated by the project for use in webinars and articles.

58. After Mrs. Patterson rejected the proposal, Ms. Senecal suggested that she could increase the proposal to thirty thousand dollars ($30,000.00) but Mrs. Patterson rejected that as well. There was no good business reason for Mrs. Patterson to reject the proposals.

59. When Mr. Johnson returned from vacation, he asked Ms. Senecal to submit the initial new vendor-sponsored project at fifteen thousand dollars ($15,000.00). She did, and Mr. Johnson approved it.

60. The proposal was delayed by the client until October. Initially Callahan wanted to launch a publicity campaign around the proposal, which was set to launch in early summer, 2010, but the client said that it would not be ready to participate in such a campaign until October.

## VII.   Callahan Closes ISC as a Pretext for Terminating Ms. Senecal

61. In late June, 2010, Mr. Johnson told Ms. Senecal that Callahan was discontinuing ISC. At the time, Mr. Johnson did not tell Ms. Senecal that her position would be terminated.

62. ISC had struggled for some time for several reasons, as is described in subsequent paragraphs. Most of the problems facing the ISC were the result of Callahan failing to support the program.

63. When ISC was founded, there was a sales person assigned to it. That position was terminated in 2002 by Mr. Patterson.

64. In September of 2008, Mrs. Patterson decided to remove ISC from the Callahan web site for a six month period. During that time, ISC had no online presence, which made subscriptions to ISC more difficult to sell, and links in articles that referred to ISC were broken.

65. Callahan ignored Ms. Senecal's requests for support for ISC. For example, Callahan did not provide any marketing support despite Ms. Senecal's requests to market ISC to credit unions as part of packages with other Callahan products.

66. Ms. Senecal was expected to provide marketing services for ISC, on top of her typical workload, but other products had specific sales staff assigned to them to perform similar marketing services.

67. Callahan management did not take ISC marketing materials to conferences or otherwise promote the ISC at conferences. Marketing materials for other Callahan products, including peer-to-peer financial software and various Callahan webinars were taken to conferences and promoted by Callahan management.

68. In 2008, Mrs. Patterson reduced the number of ISC surveys each year from four to three. This reduction reduced the value of subscribing to ISC for individual credit unions because they would receive one fewer survey per year while being charged the same amount. The price of a subscription to the ISC did not change at that time.

69. Ms. Senecal was the only Callahan employee directly responsible for the ISC. Other employees worked on ISC projects from time to time, but no one other than Ms. Senecal consistently worked on ISC projects. Because Ms. Senecal was the only Callahan employee who consistently worked on ISC projects, she was the only Callahan employee affected by Callahan's lack of support for ISC.

VIII.  **Callahan's Termination of Ms. Senecal**

70. On June 30, 2010, Mr. Johnson told Ms. Senecal that her position would be terminated because the ISC had been shut down, and there was not enough work remaining in Ms. Senecal's duties to support a position.

71. Mr. Johnson's statement regarding Ms. Senecal's duties outside of ISC was not correct, as Ms. Senecal remained responsible for the following duties:

    a. Building recognized expertise in internet strategies through regular analysis/commentary on key issues impacting credit unions. Gaining an understanding of the market and competitive context by interpreting relevant publications and articles and engaging in ongoing interaction with experts from within and outside the credit union industry. Driving Revenue through speaking engagements. Exhibit B.

    b. Evaluating and developing other research projects as appropriate, including partnerships with SCS and other vendors. Exhibit B.

    c. Working across business units on Callahan research projects as they are determined. Exhibit B.

    d. Working with Content positions in Media and Analytics business units to ensure a cohesive approach to Callahan's industry analysis and research." Exhibit B.

e. Designing and testing surveys, and reporting and presenting data to clients.

f. Conducting all Callahan survey research efforts, including developing survey questionnaires and providing results to clients.

g. Producing webinars periodically.

h. Conducting internal research studies and generating research reports.

i. Speaking for Callahan during webinars, and acting as a company representative with the press.

72. In the same conversation on June 30, 2010, Mr. Johnson said that Ms. Senecal would be offered a new position at Callahan as an independent contractor. He said Ms. Senecal would be allowed to come up with work proposals, but had little other information at the time.

73. Mr. Johnson met with Ms. Senecal again on July 9, 2010 regarding the independent contractor position, but he had no further information at that time. Mr. Johnson told Ms. Senecal he would prepare a proposal in writing.

74. Ms. Senecal received Mr. Johnson's proposal on July 13, 2010. The proposal offered no benefits, no 401(k), profit sharing, or healthcare. Ms. Senecal would not be guaranteed a minimum number of hours, and Ms. Senecal would have to propose and create her own opportunities for work. The proposal required a

response by July 16, 2010. Up until that point, Ms. Senecal had been provided health care and a 401(k) plan through her employment with Callahan.

75. Under Mr. Johnson's proposal, Callahan staff members had no incentive to respond to Ms. Senecal's requests for work or to use her for projects, and in some cases there were disincentives in place to use Ms. Senecal's services, as is described in subsequent paragraphs.   Ms. Senecal would no longer report to any particular manager, but would need to approach project staff who ranged from junior level employees to managers.

76. Groups within Callahan who used Ms. Senecal's services would be responsible for paying her salary, while they could use someone already on staff at no additional cost.

77. The independent contractor position would have required that Ms. Senecal work from home. This would have been impracticable, because Ms. Senecal needed regular access to sales people in the Callahan office, and she would have needed to be available to vendors in the Callahan office. In addition, because Ms. Senecal would have been responsible for creating webinars, she would have needed to interact with Callahan marketers on a regular basis, which she could not do from home. Finally, there were frequently meetings in the Callahan office in which participants discussed articles for particular publications. Ms. Senecal would not have been able to participate in those meetings.

78. As an independent contractor, Ms. Senecal would have no authority to order Callahan sales staff to meet deadlines for her projects.

79. As an independent contractor, Ms. Senecal would not be compensated for her time spent developing business or obtaining work.

80. Under Mr. Johnson's proposal, Ms. Senecal's hourly wage would be fifty dollars ($50.00) per hour. Another younger contractor working for Callahan, Sharon Simpson (hereafter "Ms. Simpson"), was paid sixty five dollars ($65.00) per hour. Ms. Simpson, a white woman in her 30s, was a former Callahan employee who voluntarily left in 2003 or 2004. She then worked for a credit union for some time, and then voluntarily opened her own marketing firm. Ms. Simpson had clients other than Callahan.

81. Under Mr. Johnson's proposal, Ms. Senecal would be paid for ten (10) hours of work for each webinar, but webinars typically took twenty five (25) to thirty five (35) hours to complete.

82. Ms. Senecal provided a counter-proposal on July 16, 2010 that guaranteed Ms. Senecal twenty five (25) hours of work per week. Mr. Johnson denied the counter-proposal that same day.

83. When Ms. Senecal asked Mr. Johnson how to go about generating work as an independent contractor, Mr. Johnson said he had no idea, and that Ms. Senecal needed to create her own opportunities. Mr. Johnson offered no further assistance.

84. On July 16, 2010, Ms. Senecal asked Mr. Johnson when her position would be terminated, and when her benefits would end. Mr. Johnson told her that her

position would be terminated three business days later on July 21, 2010, though Callahan would continue to pay Ms. Senecal's health benefits through the end of July, 2010.

85. On July 19, 2010, Ms. Senecal sent an email to Mr. Johnson requesting further information regarding her transition from employee to independent contractor. In the email, she expressed willingness to submit proposals for contract work based on her availability, given that she needed to find a new full time job.

86. Later on July 19, 2010, after Ms. Senecal sent her email, she was called into a meeting with Ms. Terry, Callahan's Human Resources Manager. Ms. Terry said that no income was guaranteed to Ms. Senecal if she took the independent contractor position.

87. When Ms. Senecal asked Ms. Terry about severance packages, Ms. Terry stated that she was unable to discuss whether Callahan had a severance policy in place.

88. Ms. Senecal told Ms. Terry that some of Ms. Senecal's responsibilities were being given to interns, including a social media webinar that was assigned to Ms. Gekas, and writing web site articles, which was assigned to Ms. Gekas, Mr. Patrick Sebastian, and Ms. Clark. Ms. Terry responded that she was unaware of such an occurrence.

89. Ms. Terry was unable to provide Ms. Senecal with a job description for the independent contractor position.

90. Ms. Senecal's employment was terminated on July 21, 2010.

91. After Ms. Senecal's termination, her duties were distributed to younger and significantly less experienced employees. Ms. Senecal's duties were not eliminated. For example, before her termination, Ms. Senecal worked on a study called the Retail Investment Services Study. After Ms. Senecal's termination, Ms. Cole, an employee in her twenties, replaced Ms. Senecal on that project.

IX. **Callahan's Offer of a Work Contract After Ms. Senecal's Termination**

92. Ms. Senecal was offered eighty (80) hours of severance pay in exchange for a release of all claims, and another condition: Ms. Senecal had to continue performing certain tasks for Callahan. Because it required Ms. Senecal to continue working, the severance package was actually a two week work contract. Exhibit C, Severance Agreement.

93. The two week employment package that Callahan offered in place of a severance package required that Ms. Senecal train a co-worker to perform a key aspect of Ms. Senecal's job, using survey software called Apian. Exhibit C. Ms. Senecal was not told who that co-worker would be.

94. The two week employment package that Callahan offered in place of a severance package also required that Ms. Senecal complete work on a credit union technology survey Ms. Senecal was working on at the time of her termination. Exhibit C.

95. The two week employment package that Callahan offered in place of a severance package also required that Ms. Senecal complete work on the "Ongoing Operations Report." Exhibit C.

96. Ms. Senecal did not agree to the two week employment package that Callahan offered in place of a severance package. Ms. Senecal was concerned that the two week employment package would require ongoing obligations from her, including teaching another employee to use survey software, a task with no defined ending.

## X. Callahan's Treatment of Other Employees

97. Younger Callahan employees who were terminated received much more generous severance packages than Ms. Senecal. Ryan Rex, a bookkeeper in his 20s who had been with Callahan for two (2) years, received three (3) weeks of severance pay. Zach Fajen, a receptionist in his 20s who had been with the company for less than a year, received two (2) weeks of severance. Neither of their severance packages required that they do more work for Callahan.

98. No other Callahan employees were converted to independent contractor positions, though Ms. Simpson worked for Callahan as an independent contractor.

99. Hunter Moss, a Corporate Communications Manager in his mid 50s, was terminated by Callahan in July of 2009 in an alleged reorganization and reduction in force. However, Mr. Moss's duties were not eliminated, and instead were given

to Rebecca Wessler, a new hire in her 20s. At the time of his termination, Mr.

Moss told a Callahan employee that he had been discriminated against by

Callahan because of his age.

100.     Upon information and belief, no employees over the age of forty (40) were

ever promoted at Callahan during Ms. Senecal's time there.

101.     Due to Callahan's discriminatory practices, Ms. Senecal was deprived of

advancement opportunities and a bias-free workplace, and was forced out of her

job in favor of younger, less experienced personnel.

## XI. Callahan's Racial Discrimination Against African-American Employees and Job Applicants

102.     During the eight and a half (8.5) years that Ms. Senecal worked for

Callahan, the company hired approximately twenty (20) interns. None of them

were African-American.

103.     Because Callahan did not hire African-American interns, and because

Callahan frequently hired interns and former interns to full time positions, African-

Americans were not given the same opportunities to apply for open full time

positions at Callahan as non-African-Americans.

104.     When Callahan had or created job openings, they were almost exclusively

filled with young, non-African-American recent college graduates or interns who

had worked at Callahan. During Ms. Senecal's time with Callahan, the company

hired approximately thirty six (36) such employees. Only one, Stefanie Alofoje,

was African-American, and Ms. Alofoje was not offered a full time position at the conclusion of the Callahan training program.

105.    At the time of Ms. Senecal's termination, Callahan did not employ any African-Americans.

106.    No African-Americans were hired into management or executive positions at Callahan during Ms. Senecal's time there.

107.    No African-Americans worked in Ms. Senecal's work group during her time at Callahan.

108.    During Ms. Senecal's time with Callahan, she worked with over one hundred (100) different Callahan employees. Just five were African-American: Ms. Charlene Ledbetter, a researcher in her twenties; Ms. Stephanie Olofoje, an associate/intern in her twenties; Mr. Oluseyi Oduolowu, an employee in his twenties in charge of webinar production; Ms. Germain Thomas, a programming intern in her twenties; and Ms. Tanisha Jefferson, a receptionist in her twenties.

109.    Callahan hired the Caucasian children of Callahan executives, including Mr. Filson and Mr. Wendell Sebastian. By doing so, Callahan deprived better qualified and more experienced African-American candidates from applying for, and being hired to, those positions.

110.    Ms. Senecal is strongly opposed to discrimination against African-Americans. The discrimination against African-Americans by Callahan, and the resulting exclusion of African-Americans from the workforce, and the resulting

depravation of Ms. Senecal's opportunity to associate at work with African-Americans, constitutes an injury in fact to Ms. Senecal.

111.     Ms. Senecal enjoys, and benefits from, associating with a diverse group of people in both the workforce, and in her personal life, including African-Americans. Ms. Senecal has numerous African-American friends.

112.     Due to Callahan's discriminatory practices, Callahan employees, including Ms. Senecal, were deprived of (1) the opportunity to associate with African-Americans in the workplace; (2) the benefits arising from association with racial minorities in a working environment unaffected by discrimination; (3) the benefits of interracial harmony; (4) the benefits of a work environment conductive to interracial harmony and association; (5) interpersonal contacts with African-Americans; (6) the associational benefits of working with African-Americans; (7) a work environment free of racial discrimination; and (8) their right to work in an environment unaffected by racial discrimination.

113.     Because it is located in Washington, D.C., Callahan had access to a large pool of African-American job applicants with excellent educational and professional backgrounds. Callahan could have hired qualified African-Americans to fill job openings and internships, but instead it chose to hire non-African-Americans.

## XII.   Other Violations of D.C. and Federal Law

114.      Callahan failed to provide sick leave to Ms. Senecal in violation of the D.C.

Accrued Sick and Safe Leave act. D.C. Act. 17-324 §§ 3, et seq. This is further

evidence of Callahan's willingness to violate D.C. and federal law.

115.      Callahan failed to provide an election notice regarding health insurance to

Ms. Senecal upon her termination as required by the federal Consolidated

Omnibus Budget Reconciliation Act (COBRA). Pub.L. 99-272, 100 Stat. 82. This

is further evidence of Callahan's willingness to violate D.C. and federal law.

## COUNT I

### (Age Discrimination in Violation of the D.C. Human Rights Act)

116.      Plaintiff repeats and alleges each and every allegation contained in the

preceding paragraphs of this complaint.

117.      At the time of the actions described herein, Plaintiff was of a protected

class within the meaning of the D.C. Human Rights Act, having turned forty (40)

years of age on January 27, 2005. D.C. Code § 2-1402.41(1). Defendant's

treatment of Plaintiff described herein leading to her termination was, wholly or

partially, because of her age, and thus in violation of the D.C. Human Rights Act,

as described in paragraph 118, below.

118.      As is explained in preceding paragraphs, evidence of Callahan's age

discrimination includes, but is not limited to, the facts that Callahan (a) took Ms.

Senecal's duties away from her and gave those duties to significantly younger

and less experienced interns; (b)failed to create a bonus plan for Ms. Senecal or

pay her a bonus despite the fact that such bonus plans were created and bonuses paid for younger employees; (c) failed to provide Ms. Senecal with a vacation day when all other Callahan employees received one for meeting company-wide goals; (d) promoted Ms. McGee to a new relationship manager position without allowing Ms. Senecal to apply for the position; (e) awarded twenty dollar ($20) bills to younger staffers, but not to Ms. Senecal; (f) terminated Ms. Senecal's employment and distributed her duties to younger employees; and (g) offered Ms. Senecal an independent contractor position at a lower rate of pay than another contractor who was in her 30s.

119.    As a consequence of the foregoing illegal discrimination, Plaintiff has been deprived of employment opportunities, a bias-free work environment, and ultimately deprived of continued employment with Callahan.  Plaintiff suffered damages, including but not limited to all of the wages and benefits that she would have received pursuant to that employment relationship; and further requests punitive damages.

120.    WHEREFORE Plaintiff requests that this Honorable Court enter judgment in her favor as follows:

121.    Award Plaintiff compensatory damages for losses flowing from the Defendant's illegal discrimination; and

122.    Award Plaintiff punitive damages; and

123.    Award Plaintiff back pay and the value of lost benefits, plus pre-judgment interest, for the period of time from the date of her termination to the entry of judgment; and

124.    Award Plaintiff her reasonable attorneys' fees and costs of this litigation; and

125.    Award Plaintiff such other and further relief as the Court may deem appropriate.

## COUNT II

## (Racial Discrimination in Violation of the D.C. Human Rights Act)

126.    Plaintiff repeats and alleges each and every allegation contained in the preceding paragraphs of this complaint.

127.    The actions of the Defendant constitute illegal racial discrimination under the D.C. Human Rights Act. D.C. Code § 2-1402.41(1). Defendant's failure to hire African-Americans described herein was, wholly or partially, because of race, and thus in violation of the D.C. Human Rights Act, as described in paragraph 128, below. Such activity directly affected and harmed Plaintiff.

128.    As is explained in preceding paragraphs, evidence of Callahan's race discrimination and disparate treatment of African-Americans includes, but is not limited to, the facts that Callahan (a) failed to hire any African-American interns; (b) almost exclusively filled openings with young, non-African-American recent college graduates and interns; (c) failed to hire any African-Americans into management or executive positions; (d) employed just five African-Americans during Ms. Senecal's time at Callahan; (e) hired the Caucasian children of Callahan executives, and in doing so deprived better qualified and more experienced African-American candidates from applying for, and being hired to, those positions.

31

129.     As a direct and proximate result of Defendant's discrimination against African-Americans, Plaintiff is a person aggrieved by the unlawful discriminatory practices of Callahan within the meaning of the D.C. Human Rights Act.

130.     As a consequence of the foregoing illegal actions, Plaintiff has suffered damages, including but not limited to exposure to a discriminatory work environment and the deprivation of association with African-Americans in the workplace; and further requests punitive damages.

131.     WHEREFORE Plaintiff requests that this Honorable Court enter judgment in her favor as follows:

132.     Award compensatory damages for losses flowing from the Defendant's illegal discrimination; and

133.     Award punitive damages; and

134.     Award back pay and the value of lost benefits, plus pre-judgment interest, for the period of time from the date of her termination to the entry of judgment; and

135.     Award Plaintiff her reasonable attorneys' fees and costs of this litigation; and

136.     Award Plaintiff injunctive relief, ordering, inter alia, the cessation of Callahan's unlawful racial discrimination in hiring; and

137.     Award Plaintiff such other and further relief as the Court may deem appropriate.

Respectfully submitted,


Robert B. Fitzpatrick, Esq.
Bar No. 040410

Robert B. Fitzpatrick, PLLC
1825 Connecticut Avenue, N.W.
Universal Building South
Suite 640
Washington, D.C. 20009-5728
Telephone: 202-588-5300
Fax: (202) 588-5023
Email: fitzpatrick.law@verizon.net

Dated:  July 22, 2011

Attorney for the Plaintiff

33

# Exhibit A

## TOLLING AGREEMENT

This Tolling Agreement (the "Agreement") is made as of this 1st day of June, 2011 (the "Effective Date"), by and among Ms. Denise Senecal ("Senecal") and Callahan & Associates, Inc. ("Respondent").

1. **Subject Matter of Dispute.** Senecal has asserted claims against Respondent of age and race discrimination in violation of the District of Columbia Human Rights Act, D.C. Code §§ 1-1402.1 *et seq.* ("DCHRA"). Respondent, through its counsel, denies any liability to Senecal for the claims asserted by Senecal. If Senecal files a complaint or administrative charge in this matter, Respondent intends to assert all available defenses to any and all claims asserted by Senecal. Such defenses may include but will not be limited to affirmative defenses pertaining to the applicable statutes of limitation. Senecal and Respondent have been engaging in good-faith discussions in an effort to resolve Senecal's claims. Senecal and Respondent desire to preserve the status quo during such discussions, and to preclude the lapse of any period of damages that has not already lapsed as of May 31, 2011, and thereby to obviate the need to commence any legal proceedings during the period of such discussions. Either party may terminate this Tolling Agreement by giving written notice to the other party. Such written notice may be given by email to the attorney for the other party. Five (5) business days following the transmittal of such written notice (the "Termination Date"), this Tolling Agreement shall expire.

2. **Consideration and Agreement.** For and in consideration of the mutual covenants herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties do hereby agree as follows:

    **a.**    **Tolling Agreement.**  Senecal and Respondent agree that in determining the applicability of the statute of limitations to the claims identified in Paragraph 1 hereof, and any counterclaims Respondent may assert thereto, the period from June 1, 2011, through and including the fifth (5th) business day following the transmittal of the notice referenced in numbered paragraph 1 above, shall not be included.  By executing this Tolling Agreement, Respondent does not waive its right to assert, at any time, any defense based upon statutes of limitations, statutes of repose, laches, or any other legal or equitable time-related defenses which existed, which may have existed, or which might have been asserted prior to the effective date of this Agreement.  It is the parties' intent that this Agreement shall not enlarge any limitations period applicable to any claim of any party.  Rather, the parties intend only that the running of the applicable limitations period will be suspended for the Tolling Period described above.

    **b.**    **Termination.**  The Tolling Period provided for in this Agreement shall terminate on the fifth (5th) business day following the transmittal of the notice referenced in numbered paragraph 1 above.

    **c.**    **Agreement to Forbear.**  Senecal agrees to forbear initiating any lawsuit or other legal or administrative proceeding against Respondent until on or after the Termination Date.  On or after the Termination Date (including any mutually-agreed to extension hereof), Senecal shall have the right to file and pursue any and all claims and seek any and all legal remedies against Respondent that may be available to Senecal, if any, and Respondent shall be entitled to assert any statute of limitation, laches, or other defenses, if any, as are available to it, subject to the terms of this Agreement.

3. **No Other Defenses Affected.** No defenses are affected by this Agreement other than the statute of limitations and then only to the extent set forth in this Agreement. This Agreement does not affect, extend or revive any already-expired limitations period or waive or otherwise affect any defense related to the passage of time that was applicable prior to the Effective Date of this Agreement.

4. **Confidentiality.** Senecal and Respondent agree that the existence and terms of this Agreement are strictly confidential and shall not be disclosed (orally, in writing, or otherwise) to anyone other than Senecal, Respondent, and their respective counsel without the written consent of the other party, except that either party may disclose the existence and/or terms of the Agreement, if necessary, in any proceeding to enforce its terms or otherwise as required by applicable law or regulation.

5. **Non-Admission.** This Agreement shall not constitute an admission of liability of any kind by any Party. Neither this Agreement nor any action taken pursuant to this Agreement shall be offered or received in evidence in any action or proceeding for any reason, except to enforce this Agreement.

6. **Miscellaneous.**

    a.    **Reliance on Own Judgment.** Each party hereto enters into this Agreement based on her or their own best judgment as to her or their own best interests, and not based on any promise, representation, agreement or consideration not reflected in this Agreement. This Agreement contains the entire agreement of the parties, and there have been no offers or inducements to enter into the Agreement except as stated herein.

    **b.**    <u>Execution</u>. To facilitate the execution of this Agreement, it may be executed by electronic mail or facsimile in multiple counterparts, each of which shall constitute an original, but which together shall constitute a single Agreement. This Agreement may be executed on behalf of Senecal by her counsel, Robert B. Fitzpatrick of Robert B. Fitzpatrick, PLLC. This Agreement may be executed on behalf of Respondent by its counsel, Teresa Burke Wright of Jackson Lewis, LLP. Each party hereto agrees that, in the event of ensuing litigation between them, she or it will not seek to disqualify Robert B. Fitzpatrick of Robert B. Fitzpatrick, PLLC or Teresa Burke Wright of Jackson Lewis, LLP, or any of their affiliated lawyers as counsel based solely on their execution of this Agreement.

    **c.**    <u>Parties Bound and Modification</u>. This Agreement shall be binding on the predecessors, successors, and assigns of each party hereto, as well as their heirs, executors, and administrators. This Agreement may be modified only by a writing signed on behalf of each of the parties that expressly refers to this Agreement.

    **d.**    <u>Severability.</u> In case any one or more of the provisions contained in this Agreement is or becomes invalid, illegal, or unenforceable in any respect, the validity, legality, and enforceability of the remaining provisions herein shall in no way be affected, prejudiced, or disturbed thereby.

    **e.**    <u>Governing Law</u>. This Agreement shall be construed under and governed by the laws of the District of Columbia.

    Agreed, as of the date first set forth above.

-4-

Ms. Denise Senecal

By: _____

Robert B. Fitzpatrick, Esq.
Robert B. Fitzpatrick, PLLC

Attorney for Denise Senecal

Callahan & Associates, Inc.

By: _____ 6/1/11

Teresa Burke Wright, Esq.   Tolling Agt.
Jackson Lewis, LLP

Attorney for Callahan & Associates, Inc.

-5-

# Exhibit B

**Callahan Leadership**
**Research Manager Position Description**

**Leadership Vision**: Further Callahan's role as a credit union thought leader by identifying and advancing cooperative models and strategies that help to ensure a vibrant cooperative financial services system.

**Leadership Mission**: Callahan works with leaders across and outside the credit union system to identify, understand and develop points of view on key issues that affect the cooperative financial services model. Interaction with both individual institutions and credit union groups helps us gain insight into the key issues.

**Leadership Key Revenue Drivers:**
- *Consulting*
- *Speaking*
- *Leadership Program*
- *Survey Consortium*
- *Callahan Report*
- *Credit Unions Rising*
- *Other Research*

**Leadership Key Success Measures:**
- Business unit financial performance, including margins and employee productivity measurements
- Growth of Leadership Program base to build recurring revenue
- Visibility of Callahan on key industry issues, both within and outside the industry

**Analytics Knowledge Centers:** TBD

**Position Responsibilities:**

- Lead Survey Consortium, including developing and executing topics with members, building client base, and evaluating business model.

- Build recognized expertise in internet strategies through regular analysis/commentary on key issues impacting credit unions. Gain an understanding of the market and competitive context by interpreting relevant publications and articles and engaging in ongoing interaction with experts from within and outside the credit union industry. Drive revenue through speaking engagements.

- Evaluate and develop other research projects as appropriate, including partnerships with SCS and other vendors

- Work across business units on Callahan research projects as they are determined

- Work with Content positions in Media and Analytics business units to ensure a cohesive approach to Callahan's industry analysis and research

**Essential Skills**

- Interest in and understanding of key issues and opportunities for credit unions and their members
- Ability to analyze and communicate clearly and concisely, via both oral and written presentation, points of view on key credit union issues
- Ability to think through the implications of market, competitive, regulatory and economic changes for credit unions
- Self-directed

**Goals**

- Regularly contribute articles for CreditUnions.com and Callahan publications, and other new media
- Build recurring revenue through development of ISC
- Build audience(s) of industry contacts within knowledge center (e.g. subscribers to e-update category, a new CU Strategies blog, etc).
- Lead webinars for knowledge center areas as assigned

# Exhibit C



## SEVERANCE AGREEMENT

1. This Agreement is made between Denise Senecal ("Employee") and Callahan & Associates, on behalf of itself and its subsidiaries, owners, agents, employees and any persons related to or acting on behalf of the Company (hereinafter generally referred to as "Callahan's").

2. It is recognized herein that Employee's employment with Callahan's has terminated effective July 21, 2010 (the "Termination Date"), and that Callahan's wishes to provide certain separation benefits to Employee to aid in Employee's transition to other employment in exchange for this release.

3. Callahan's shall pay Employee the lump sum in an amount equal to eighty (80) hours of her base hourly salary in one installment on August 15, 2010.

4. Callahan's shall pay for Employee's COBRA benefits through August 31, 2010.

5. In exchange for the above promises and agreements, including Callahan's retention of Employee as an employee until the Termination Date, Employee personally agrees to the four (4) outstanding:

    a. Completing the Ongoing Operations Report
    b. Completing the Technology Report
    c. Serving as a resource for training on the Apian survey software
    d. Serving a s resource via telephone or e-mail to answer questions regarding processes, location of files, contact information, etc.

6. Employee shall promptly return all Callahan's property provided to Employee or in Employee's possession or control. In the event Employee fails to return Callahan's property in accordance with the terms of this Agreement and the Nondisclosure Agreement, Callahan's shall have the right to offset against payments or benefits owing to Employee hereunder the replacement value of any and all such unreturned property.

7. All required and authorized payroll deductions will be withheld from the amounts to be paid to Employee under this Agreement. Employee's ability to exercise Employee's vested options following the Termination Date shall be governed by the provisions of Employee's stock option agreements.

_____

Denise Senecal

_____

Date

Leigh Anne Terry

7/21/2010

Date

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

Ms. Denise Senecal                         )
3212 Ashmead Place, N.W.                    )
Washington, D.C. 20009                      )
                                            )
            Plaintiff,                       )
                                            )
    v.                                       )
                                            )
Callahan & Associates                        )     Civil Action No. _____
1001 Connecticut Avenue, N.W.                )
Suite 1001                                   )
Washington, DC 20036                         )
                                            )
SERVE ON:                                    )
C T Corporation System                       )
1015 15th Street, N.W.                       )
Suite 1000                                   )
Washington, D.C. 20005                       )
                                            )
            Defendant.                        )

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all counts.

_____
Robert B. Fitzpatrick, Esq.
Bar No. 040410

Robert B. Fitzpatrick, PLLC
1825 Connecticut Avenue, N.W.
Universal Building South
Suite 640
Washington, D.C. 20009-5728
Telephone: 202-588-5300
Fax: (202) 588-5023
Email: fitzpatrick.law@verizon.net

Dated:  July 22, 2011

                                    Attorney for the Plaintiff

# Exhibit 2

## SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA

DENISE SENECAL,

        Plaintiff,

      v.

CALLAHAN & ASSOCIATES, INC,

        Defendant.

Civil Action No. 0005892-11

## NOTICE TO ALL PARTIES OF FILING NOTICE OF REMOVAL

PLEASE TAKE NOTICE THAT Defendant Callahan & Associates, Inc. ("Callahan"), has this date filed its Notice of Removal pursuant to 28 U.S.C. § 1446, a copy of which is attached to this Notice, in the office of the Clerk of the United States District Court for the District of Columbia.

Respectfully submitted,

**JACKSON LEWIS, LLP**

October 4, 2011

Teresa Burke Wright (D.C. Bar No 429196)
JACKSON LEWIS, LLP
10701 Parkridge Blvd., Suite 300
Reston, VA 20191
Tel:    (703) 483-8300
Fax:    (703) 483-8301
E-mail: WrightT@jacksonlewis.com

Counsel for Callahan & Associates

## CERTIFICATE OF SERVICE

I herby certify that on October 4, 2011, a true and correct copy of the foregoing *Notice to All Parties of Filing Notice of Removal* was served on all parties by U.S. mail, with postage properly affixed and addressed as follows:

> Robert B. Fitzpatrick, PLLC
> 1825 Connecticut Avenue, NW
> Universal Building South
> Suite 640
> Washington, DC 20009

> Teresa Burke Wright (D.C. Bar No. 429196)
> JACKSON LEWIS, LLP
> 10701 Parkridge Blvd., Suite 300
> Reston, VA 20191
> Tel:    (703) 483-8300
> Fax:    (703) 483-8301
> E-mail: WrightT@jacksonlewis.com

> Counsel for Callahan & Associates

4820-7978-1386, v. 1

2